UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| LINDA RODERIQUES, as Administratrix of the Estate of DONALD RODERIQUES; LINDA RODERIQUES Individually; LINDA RODERIQUES, as Mother and Next Friend to MANDI RODERIQUES, minor | |
| Plaintiffs, | C.A. No. 04-26-L |
| V. | |
| AMERICAN FOAM CORPORATION; FOAMEX INTERNATIONAL; BARRY H. WARNER; TRITON REALTY LIMITED PARTNERSHIP; JEFFREY DERDERIAN; MICHAEL DERDERIAN; DERCO, LLC; MANIC MUSIC MANAGEMENT, INC.; JACK RUSSELL, MARK KENDALL; DAVID FILICE; ERIC POWERS; DANIEL BICHELE; PAUL WOOLNOUGH; KNIGHT RECORDS INC.; ANHEUSER-BUSCH COMPANIES, INC.; MCLAUGHLIN & MORAN, INC.; LUNA TECH, INC.; LUNA TECH PYROTECHNIC GMBH; CLEAR CHANNEL COMMUNICATIONS INC., d/b/a WHJY-FM; MOTIVA ENTERPRISES, LLC; SHELL OIL COMPANY; TOWN OF WEST WARWICK, DENNIS LAROCQUE, STATE OF RHODE ISLAND and IRVING J. OWENS. | FILED JUN 18 2004 U.S. DISTRICT COURT DISTRICT OF RHODE ISLAND |
| Defendants | |

36

**PLAINTIFFS' MOTION IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND REQUEST FOR THE ALLOWANCE OF DISCOVERY**

Now comes the Plaintiffs in the above-entitled cause in opposition to Foamex's Motion to Dismiss and requests that this Court not act on same until adequate discovery has been completed to properly address Defendant's claims in its motion.

In as much as this Court has stayed discovery until September 01, 2004, and Plaintiff is unable to properly address the issues raised in the Defendant's Motion without discovery, Plaintiffs requests that until these preliminary matters are resolved, and sufficient discovery is performed, that Defendant's Motion is premature and should be denied.

Plaintiffs would further refer this Court to his memorandum attached hereto.

Plaintiffs
By their attorney
BRIAN CUNHA & ASSOCIATES

Brian R. Cunha, Esquire #4074
311 Pine Street
Fall River, MA 02720
Phone: (508) 675-9500
Fax: (508) 679-6360

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

LINDA RODERIQUES, as Administratrix of the Estate of DONALD RODERIQUES; LINDA RODERIQUES Individually; LINDA RODERIQUES, as Mother and Next Friend to MANDI RODERIQUES, minor

Plaintiffs,

C.A. No. 04-26-L

V.

AMERICAN FOAM CORPORATION; FOAMEX INTERNATIONAL; BARRY H. WARNER; TRITON REALTY LIMITED PARTNERSHIP; JEFFREY DERDERIAN; MICHAEL DERDERIAN; DERCO, LLC; MANIC MUSIC MANAGEMENT, INC.; JACK RUSSELL, MARK KENDALL; DAVID FILICE; ERIC POWERS; DANIEL BICHELE; PAUL WOOLNOUGH; KNIGHT RECORDS INC.; ANHEUSER-BUSCH COMPANIES, INC.; MCLAUGHLIN & MORAN, INC.; LUNA TECH, INC.; LUNA TECH PYROTECHNIC GMBH; CLEAR CHANNEL COMMUNICATIONS INC., d/b/a WHJY-FM; MOTIVA ENTERPRISES, LLC; SHELL OIL COMPANY; TOWN OF WEST WARWICK, DENNIS LAROCQUE, STATE OF RHODE ISLAND and IRVING J. OWENS.

Defendants

JUN 18 2004
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND REQUEST FOR THE ALLOWANCE OF DISCOVERY**

This matter arrives before this court on Defendant's Foamex's Motion to Dismiss the claims brought against it as a result of the so called "Station Fire" that occurred in West Warwick Rhode Island on February 20, 2003, causing the death of 200 persons and injuries to scores of others.

**BACKGROUND**

By way of background, suit was originally brought by the Plaintiffs in companion cases against the Defendant Foamex, and twenty-five (25) other Defendants in the Providence Rhode Island Superior Court and the Federal District Court in Massachusetts. The Plaintiffs subsequently voluntarily transferred all of their claims to this court. The cases are now pending before this Court.

On March 29, 2004, this Court assumed jurisdiction of all claims occurring as result of the above "Station Fire". The Court, cognizant of the fact that only a small fraction of the cases that were likely to be filed, had been filed, ordered all discovery stayed until September 1, 2004, to allow the cases that had not been filed to be filed, allowing for an orderly and efficient management of this case.

Although, the Court did not stay the filing of answers to the complaint or dispositive motions, every Defendant, but Foamex agreed, that in the spirit of the order, that all matters be stayed until after September 1, 2004. Toward that end all parties but Foamex have filed stipulations to stay the filing of answers and all motions until after September 1, 2004. The court has approved every stipulation filed by the parties to extend time.

Despite the cooperation of the Plaintiffs and twenty five (25) of the Defendants, Foamex will not agree to continue the motion to dismiss until all parties have filed their claims and had an opportunity conduct critical facts depositions.[1]

It is clear that Foamex has made the decision to file this motion to take advantage of the fact that the Plaintiffs cannot conduct discovery and will be in a weaker position to rebut the critical facts and allegations contained in their brief and affidavits that accompany their motion.

There are so many critical factual, procedural and substantiative issues that are still unknown, that any meaningful analysis of the legal issues raised in the Defendant's motion requires at least some discovery before this court can properly address the Defendant's Motion to Dismiss.

## BACKGROUND

General Foam Corporation, which was acquired by Foamex International Inc. in July 2001, (See Exhibit 1), manufactured foam for sale in large sheets buns or rolls.[2] This foam is used in many applications, such as in mattresses, furniture padding, carpet underlay, audio speaker surrounds, packaging material, vibration isolation and acoustical sound proofing. (See Exhibit 2, which is an excerpt from the Foamex Internet Home Page)[3] General Foam presumably

[1] The Plaintiff initially requested one extension to file its response to the Defendant's Motion to Dismiss and was given until June 18, 2004 to respond. Plaintiff after reviewing the Motion and researching the law has requested that the Motion to Dismiss be continued until after discovery has been completed. Defendant has denied this request.

[2] General Foam was not named as a Defendant as they ceased to do business after their acquisition by Foamex.

[3] Presumably General Foam also sold its foam to a variety of distributors and fabricators, however, at this present time the critical facts surrounding General Foam, its, manufacturing,

sold its foam to various distributors and fabricators which, in turn may have cut and further processed the foam for a particular application. Limited discovery has revealed that one of General Foams customers was American Foam Company. It appears that American Foam Company in one of its applications would cut stacks of foam into smaller shapes for use as packaging material for the cosmetic industry. However, its unknown whether they sold foam for other applications such as sound proofing and whether General Foam was aware of its other applications. On June 27, 2000 there is also information that American Foam allegedly sold foam sheets to the Derderians who subsequently installed them in the Station Night Club for use as an acoustical barrier for sound proofing. Based upon the information available to the Plaintiffs they filed suit against Foamex, and have asserted five (5) theories of liability as follows:

1. That Defendant Foamex was negligent;
2. That by Foamex was strictly liable as the "foam" was dangerous and a defective product;
3. Defendant breached its duty to adequately warn the plaintiffs of its dangerous condition, for its intended use;
4. Defendant breached its implied warranty of merchantability; and
5. Defendant breach its express warranties.

The Defendant in its motion claims as a matter of law that Plaintiffs cannot prevail on any of these theories claiming no duty, no proximate causation due to the superceding intervening negligence of other defendants and no liability under the Bulk Supplier Doctrine.

---

marketing, and sale of foam are unknown.

In this case, however, virtually all of the critical factual information to allow the Court to assess the legal issued raised in the Defendant's motion is, at this early stage, missing. For example, even the preliminary facts surrounding the chemical characteristics, size, type and use of the foam sold by General Foam to General Foam are unknown. Also, unknown are what warnings or instructions were given, not by Foamex, but by American Foam. We also have no information on the applications or uses for which General Foam marketed its product. Although, we do know that Foamex advertised its foam for use as sound proofing (See Exhibit 2), we do not know if General Foam also marketed the foam for use as sound proofing. Nor do we know what applications for the foam sold by General Foam to its distributions and fabrications, such as American Foam, were marketed or advertised by them. The facts concerning this information is critical to the legal issues raised by the Defendant. Also, critical to this case is when did Foamex acquire General Foam. This information is unknown. Also unknown are the terms and conditions of the acquisition; where did the acquisition take place, which state law controls the acquisition and the liability of Foamex for the prior alleged tortious acts of General Foam or American Foam.

Secondly, and just as importantly, we do not have any information regarding the conduct of General Foam prior to its acquisition by Foamex or the relationship between General Foam and American Foam Corp.

The Defendant's Motion To Dismiss also suggests that the Court assume, for the purpose of the Motion, that it was Foamex and not General Foam that manufactured, tested, advertised, marketed and sold the foam to American Foam. This simplistic suggestion is factually and legally deficient. The facts concerning the actions of General Foam, not Foamex after it acquired

General Foam, is the subject of inquiry and critical in addressing the issues of duty, proximate cause, and the so called bulk supplier doctrine, raised by the Defendant in its Motion to Dismiss.

For all of the above reasons and for the reasons more fully discuss below, the Plaintiff requests that the Court deny the Motion To Dismiss as premature.

## LEGAL STANDARDS

### MOTION TO DISMISS 12(b)(6)

A claim may be dismissed either because it asserts a legal theory that is not cognizable as a matter of law or because it fails to allege sufficient facts to support a cognizable legal claim. When a claim is challenged under this Rule, the court presumes that all well-pleaded allegations are true, resolves all doubts and inferences in the pleader's favor, and views the pleading in the light most favorable to the non-moving party. Magnum Defense Inc. v. Harbor Group Limited 248 F. Supp. 2d 64, 66, (D.R.I. 2003).

In their liberality, the Rule erects a powerful presumption against dismissing pleadings for failing to state a cognizable claim for relief. Clorox Co. Porto Rico v. Proctor & Gamble Commercial Co. 228 F. 3d 24 (1st. Cir. 2003) Such dismissals are disfavored and, in view of the Rules' "notice pleading" requirements, are not routinely granted. Leleux v. United States 178 F. 3d 750 (5th Cir. 1999) A claim will only be dismissed under Rule 12(b)(6) if it appears beyond doubt that the pleader can prove no set of facts in support of the claim that would entitle the pleader to relief. Conley v. Gibson 355 U.S. 41, 71 S.CT. 99 (1957) Thus, the pleader's stated legal theory and specific requests for relief are not necessarily dispositive in ruling on a Rule 12(b) (6) motion. Barret v. Tallon 30 F. 3d 1296 (10th Cir. 1994) A claim generally will not be dismissed, even though the asserted legal theories are not cognizable or the relief sought is

unavailable, so long as other tenable legal claims are evident on the face of the complaint or the pleader is otherwise entitled to any type of relief under another possible legal theory. Conley, Id Bowers v. Hardwick 478 U.S. 186, 106 S.Ct. 2841 (1986)

In considering a Rule 12(b) (6) motion, the court will not decide the winners or losers in the case, or even examine the "believability" of the pleader's claims. Jacobson v. Hughes Aircraft Co. 525 U.S. 432, 119 S. Ct. 755 (1999) A claim will not be dismissed merely because the trial court doubts the pleader's allegations or suspects that the pleader will ultimately not prevail at trial. Scheuer v. Rhodes 416 U.S. 232, 94 S. Ct. 1683 (1974) The courts are especially hesitant to dismiss at the pleading stage claims those pressing novel legal theories, where the claims could be better examined following development of the facts through discovery. Baker v. Cuomo 58 F. 3d. 814 (2nd Cir. (995)

**Remedy and Amendments**

The court will generally permit the pleader an opportunity to amend unless an amendment would be futile. Glassman v. Computer Vision Co. 90 F. 3rd 617 (1st Cir. 1996) Even where the court doubts that the pleading defects can be overcome, the federal policy favoring decisions on the merits, rather than on technicalities, counsels in favor of permitting the plaintiff leave to amend and re-file the pleading at least once, unless the exercise is plainly futile. Ostrzenski v. Siegel 177 F. 3rd 245 (4th Cir. 1999)

**Extrinsic Materials**

The parties may produce affidavits and other materials either in support of or in opposition to a motion for failure to state a claim. However, if the court, in its discretion, considers such extrinsic evidence, the motion must be converted into a request for summary

judgment under Rule 56. Gonzales v. U.S. 284 F. 3rd 281 (2002). Generally, the court gives all parties notice of such a conversion, and provides them with an opportunity both to be heard and to present further materials in support of their positions on the motion. This notice may be actual or constructive; in some instances, a litigant's act of submitting extrinsic materials may be considered notice enough. See Country Club Estates LLC v. Town of Loma Linda 213 F. 3rd 1001 (8th Cir. 2000); David v. City of Denver 101 F. 3rd 1344 (10th Cir. 1996); Jones v. Automobile Insurance Co. 917 F. 2nd 1528 (11th Cir. 1990) Following conversion, the court is likely to permit the parties to engage in appropriate discovery before ruling on the converted motion.

The court may consider allegations contained in the complaint, exhibits attached to the complaint, matters of public record, orders of record in the lawsuit, and other materials subject to judicial notice, all without converting the motion to one for summary judgment. In some instances, the courts may even properly consider case-specific documents that are not attached as exhibits to the complaint. For example, where a portion of a document is attached as an exhibit to the complaint, the court may consider other portions, not attached as exhibits, in ruling on the motion. Gonzalez v. U.S. 284 F. 3rd 281 (1st Cir. 2002)

In this case the Defendant has attached to its Motion to Dismiss, several affidavits, and exhibits, including an alleged invoice, an alleged warning, and advertising material from American Foam Corp.. The authenticity of these materials have not been tested or proven. Moreover, no discovery has been conducted to determine, for example, what the invoice represents other than a brief explanation in the affidavit supplied by the Defendant. More importantly, the Defendant did not send the invoice, it was sent by General Foam, which as

earlier stated was acquired by Foamex after the sale. Without some discovery as to the critical facts concerning the sale it is premature to allow the Defendant to submit this material without giving the Plaintiff an opportunity to depose those persons involved in the purchase and sale of the product. The same holds true with respect to the alleged warning included as an exhibit in the Defendant's Motion to Dismiss. Again, this alleged warning was given by General Foam and not Foamex. Without some discovery with respect to the nature of the foam, its chemical composition, its combustibility, testing performed by General Foam, and prior complaints with respect to its danger, it is impossible to know whether the alleged warning was sufficient to properly apprize the Plaintiff or the distributors of the product of its danger. Finally, the Defendant has attached an advertisement from American Foam, presumably to support its assertion that American Foam sold foam products for use only in display and shipping packaging. However, this does not answer the question of whether the foam was also sold by General Foam for use as sound proofing or whether General Foam knew or should have known that the foam was used for sound proofing and what information was available to General Foam and American Foam with respect to alternative uses of the foam other than for packaging. Also, discovery is essential with respect to the advertising and marketing by General Foam of its foam products and whether General Foam advertised its product for use as sound proofing.

This Court should not accept the Defendants bald assertions of fact and legal conclusions, nor should this Court draw unwarranted inferences to aid them without the ability of the Plaintiff to conduct discovery with respect to the above exhibits and affidavits submitted by the Defendant.

**SUMMARY JUDGEMENT**

Although it is unknown whether this Court will convert the Defendant's Motion to Dismiss to a Summary Judgement motion, summary judgement is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law." Fed. R. Civ. P. 56 (c)[4]

When a motion for summary judgment is made, a court must view the evidence in the light most favorable to the non-moving party. Morrissey v. Boston Five Cents Savings Bank, 54 F. 3d 27, (1st Cir. 1995), The party opposing summary judgment may not create a dispute by simply pointing to bare allegations of facts, but rather, must "point to specific facts that were properly asserted in its affidavits and supporting materials which, if established at trial would entitle it to prevail on these matters." Over the Road Drivers, Inc. v. Transport Ins. Co. , 637 F. 2d 816, 818 (1st Cir. 1980).

Moreover, the Plaintiff has attached an affidavit in opposition to Defendant's Motion stating that "based upon the issues raised by the Defendant in its Motion to Dismiss that factual discovery is essential in order to properly decide those issues." In the event that the Court considers the Motion to Dismiss as a Summary Judgment Motion the Plaintiff would respectfully request that further discovery be allowed in order to address the Defendants Motion.

Notwithstanding the arguments earlier raised by the Plaintiff with request of the Court to allow some discovery to properly address Defendant's Motion, the case law and Fed. R. Civ. P.

---

[4] Also, Local Rule 12.1 Motions For Summary Judgments, requires that a party filing a motion for summary judgment is required, in addition to the memorandum of law, a concise statement of all material facts as to which he contends there is no genuine issue necessary to be litigated. In this case, as no discovery has been completed it is impossible that such a concise statement may be presented or agreed upon.

56 (f)[5] supports the allowance of discovery to properly address the inability to respond to critical factual issues because of incomplete discovery. Vargas - Ruiz v. Golden Arch Development Inc., 03-2225 (1st. Cir. 2004) The First Circuit has adopted this approach in requiring that the Plaintiff seek additional time in which to address the lack of factual information to properly address Summary Judgement Motions, See Vargas - Ruiz v. Golden Arch.

**THE MOTION TO DISMISS IS PREMATURE**

The Defendant, anticipating that the Plaintiff will claim that the motion is premature has asserted that the Motion To Dismiss is timely and analogizes the McVeigh case from the 7th Circuit, as his authority that the case at bar, should be resolved expeditiously and without discovery.

In the McVeigh case, the manufacturer of the fertilizer that McVeigh used as a bomb moved to dismiss the tort claims made against them at an early stage, prior to discovery. The Court dismissed the case stating that fertilizer, could not reasonably have been foreseen by the manufacturer to be used as a bomb to blow up a Federal Building in Oklahoma.

The case at bar is factually and legally quite different. Not only is it reasonably foreseeable that the "foam" manufactured and sold by General Foam or its successor corporation Foamex, could foreseeably be used as sound proofing, in fact, Foamex advertised its "foam" for use as a soundproofing material (See Attached Exhibit 2). Although, Foamex may argue that it

---

[5] The rule reads, Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

was a different foam for different uses or a different brand, nevertheless, that is precisely why discovery is required. The Court should rejects the defendant analogy as it is and with clearly distinct fact patterns.

Finally, Plaintiff will discuss each of the Defendant's defenses and why discovery of the facts is essential for the courts consideration of the issues.

**1. Duty of care.**

The Defendant first asserts in its Motion to Dismiss that it did not have a duty to prevent the fire at the Station. At the outset the Defendant incorrectly framed the duty of care owed. The correct issue is "whether the type of negligent conduct at issue is sufficient likely to result in the kind of harm experienced by the victims of such conduct that liability appropriately maybe imposed on the negligent party" Banks v. Bowens Landing Corp., 522 A.2d 1222 (R. I. 1987).

"The existence of a legal duty is purely a question of law, and the Court alone is required to make this determination." Kuzniar v. Keach, 709 A. 2d 1050, 1055 (R.I. 1998)

"A legal duty is an obligation imposed by the law upon a person. It requires that person to conform his or her actions to a particular standard. And it also carries with it a recognition that the law will enforce this duty to the benefit of other individuals to whom this duty is owed. Put another way, the existence of a legal duty depends on whether the interest that a defendant has allegedly invaded is entitled to legal protection." Kuzinar Id.

"No clear-cut formula exists" for making this determination. Hennessey v. Pyne, 694 A. 2d 691, 697 (R.I. 1997) (quoting Kenney Manufacturing Co. V. Starkweather & Shepley, Inc. 643 A. 2d 203, 206 (R.I. 1994). Rather, "under our ad hoc approach we consider all relevant factors, including the relationship of the parties , the scope and burden of the obligation to be

imposed upon the defendant , public policy considerations, and notions of fairness." Id. As the Rhode Island Supreme Court has frequently noted, the risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." Id. at 697. Volpe v. Gallagher, 821 A.2d 699 (R.I. 2003) As stated earlier, the court's task in determining duty is to evaluate whether the type of negligente conduct at issue is sufficiently likely to result in the kind of harm experienced by the victims of such conduct that liability appropriately may be imposed on the negligent party. Banks Id.

The Defendants claim that "it was neither likely nor foreseeable to Foamex that pyrotechnics would be illegally used and ignite a fire in an overcrowded, unsafe building in which packing foam sheets (manufactured by American Foam not Foamex) had been illegally applied for sound proofing and allowed to remain there for two years by oversight of the fire safety inspectors." This conclusion by the Defendant contains bald assertions of fact which have neither been proven or have been the subject of discovery. The real issue is whether Foamex and its acquired corporation, General Foam, knew or reasonably should have known that its foam products may be used or misused for sound proofing in an environment which may be subject to flammable sources. "A manufacturer must anticipate the environment in which that product will be used." Venezia v. Miller Brewer Co. 626 F. 2d. 188 (1st Cir. 1980)At present it is critical to know whether the Defendant designed, manufactured and sold foam which it knew or should have known would be used for sound proofing and whether they knew or should have known whether it was safely withstand the foreseeable product use or abuse that occurred during its use. Discovery will yield that information. For example the Defendant asserts that the foam sheets were illegally applied. At present, there has been no factual discovery with respect to the

purposes that foam sold by General Foam and American Foam was to be used. There is credible evidence that foam sold by Foamex is marketed for use as sound proofing. (See Exhibit 2) Until such time as discovery is complete there is no basis for the conclusion that the foam was illegally applied or that it was not a use that was foreseeable. Nor is there any basis for the claim that it was unforeseeable that Foamex would know that flammable material, pyrotechnics, legal or illegal would be used in the vicinity of its product, if used for soundproofing.

Where as here, " when in any given case the particular historical facts that define the legal duty are uncertain or contested and the evidence presented could support a finding either way by the jury, it is the court's function to determine and instruct the jury concerning what legal duty is owed to the plaintiff under the various alternative factual scenarios supported by the evidence. However, it is still the function of the jury to determine the existence of those predicate facts that trigger the presence of the legal duty. The court should not arrogate to itself the function of determining such facts under the guise of deciding what legal duty (if any) is owed to the plaintiff; nor should the trial justice abdicate his or her responsibility to say what duty the law imposes if the jury finds that certain duty triggering facts are proven." Kuzniar, 709 A. 2d at 1055-56.

Moreover, the Rhode Island Supreme Court has held that only the general risk of harm need be foreseen from the circumstances, not the specific mechanism or manner of the injuries actually suffered by the victims. Volpe v. Gallagher 821 A. 2d 699 (R.I. 2003). The defendant requests that this court narrowly define the circumstances and manner of injury. The Rhode Island Supreme Court has rejected this narrow interpretation of duty. "Generally the question of foreseeability constitutes an issue of fact that is properly submitted to the jury. Pantalone v.

Advanced Energy Delivery Systems Inc., 694 A. 2d 1213 (R.I. 1997) Until proper discovery is completed the issue of foreseeability is purely a question of speculation as the facts are unknown and the Court is requested to deny the Motion to Dismiss until such time as discovery is complete.

**2. Proximate cause negligence**

The Defendant claims that the Plaintiffs claims of negligence, strict liability, breach of implied warranty of merchantability and breach of express warranty should fail as the Defendant Foamex was not the proximate cause of the injuries to the Plaintiff as there were intervening superceding acts of negligence by other Defendants which broke the chain of proximate causation flowing from the Defendants original negligent acts. In essence the Defendant claims that the actions of the following Defendants: the Town of West Warwick's Building Inspector, the Derderians and Bichele was sufficient to break the legal causal chain.

At the outset the Defendants concede as they must that approximate cause is a "question of fact for the jury." Travelers Insurance Co. v. Priority Business Forms Inc., 11 F. Supp. 2d 194 (D.R.I. 1998) Moreover, for an independent intervening cause to replace a defendants original negligence as proximate cause of an accident, the original negligence and conduct must have become "totally inoperative" as the cause of the injury. Hueston v. Narragansett Tennis Club Inc., 502 A 2d 827 (R.I. 1986) It is also a fundamental tenant of tort law that there may be concurring proximate causes that contribute to a plaintiffs injury and that a defendants negligence is not always rendered remote in a causal sense merely because a second cause intervenes. Hueston Id.. "As a result, an intervening act will not insulate a defendant from liability if his or her negligence was a concurring proximate cause that had not been rendered remote by reason of the secondary

cause which intervened. Roberts v. Ketelle 116 R.I. 283, 356 A. 2d 207 (1976). The test for remoteness is:

> **"Whether the intervening act could reasonably have been foreseen as a natural and probable result of the original act of negligence of the defendant. If it could have been foreseen, the intervening negligence is not so remote as to prevent the original act from being considered at law as merely a concurring cause of the injury." State v. Dionne 442 A. 2d 876 (R.I. 1982)**

**3. Proximate Cause Lack of Warning**

At this stage, whether discovery, of the action of all of the defendants is it premature to determine whether the acts of the other Defendants were superceding intervening causes that broke the chain of causation. At the outset, all of the Plaintiffs theories impose a duty to produce products with appropriate warning instructions. Under those theories the Plaintiff has claimed that the Defendant negligently distributed the foam without adequate warnings or instructions for its safe use. LaPlant v. American Honda Motor Corp., 27 F. 3d 731 (1st Cir. 1994) (Defendant has a duty to warn if he knew of should have known about the products dangerous propensities which caused Plaintiff's injuries.) If the defendant does not provide such a warning, then the product is rendered defective. See Generally Restatement 2d of Torts Section 402 A. comment j ("to prevent the product from being unreasonably dangerous, the seller maybe required to give directions or warning, on the container, as to its use")

In the case at bar little if anything is known, about warnings, when they were given or to whom, other than the attachment to the Defendants Motion to Dismiss entitled "Warning Polyurethane is Flammable." There has been no discovery with respect to this alleged warning, when it was given and to whom. Nor has there been any discovery with respect to the composition of the products sold by General Foam or the use for which it was supplied. Until

this discovery is completed, the issue of whether intervening act of third parties could reasonably have been foreseen as a natural and probable result of the original act of the failure to warn of the defendant is impossible to determine.

**4. Proximate Cause Strict Liability**

The Plaintiff has also brought a claim that the foam was a defective product which posed a threat of injury to potential consumers. A product can be defective even when it preforms exactly as the manufacturer intended it should. In such cases, the manufacturer will be held strictly liable for defective design of a product when the entire product line is unsafe.

The "consumer expectation" test is one test that courts use to determine when a particular product has a design defect. Under this test, "a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in a reasonably foreseeable manner." Ritter v. Narragansett Electric Co., 109 R.I. 176 (1971). Dilone v. Anchor Glass Container Corp., 755 A. 2d 818 (R.I. 2000)

In the alternative, some courts use the "risk utility" test to determine whether a product has a design defect. Under the "risk utility" test, a manufacturer will be held strictly liable in tort for defective design of a product when the risks inherent in such products design are not justified by the product utility. The following factors are relevant in determining the adequacy of a products design: (1) the gravity of the danger posed by the challenged design; the likelihood that the danger would occur; the mechanical feasibility of a safer alternative design; the financial cost of the improved design; and the adverse consequences that would result from the alternative design. Barker v. Lull Engineering Co., 20 Cal. 3d 413, 573 P. 2d 443 (1978)

The Rhode Island Supreme Court utilized the "risk utility" test in Castrignano v. E. R.

Squibb and Sons 546 A. 2d 775 (R.I. 1998) in ruling that a drug manufacturer bares the burden of proven that the benefits inherent in its product out weighed its associated risks of harm.

Again, in order to evaluate all of the factors identified above and determined if the intervening acts of the other defendants broke the casual connection it is necessary that critical factual discovery be completed. For example what did the defendant knew about their product, its flammability, its toxicity, its burn rate, etc.; what information was supplied to their distributors and other down stream users as to its safe use; the Defendants marketing and advertising policies, etc. Until this information is gathered the Plaintiff is unable to adequately respond to the Defendants Motion To Dismiss.

**5. Proximate Cause Warranty Claims**

The Plaintiff has also brought a claim for breach of implied warranty of merchantability and its breach of express warranty. The Rhode Island Supreme Court, summarizing section 6A.-2-314, has stated that a breach of the implied warranty of merchantability occurs "when a product of fair average quality does not pass in the trade and is unfit for the purpose for which it is used. Thomas v. Amway Corp. 488 A. 2d 716 (R.I. 1985)" The Plaintiff requires discovery with respect to information relayed by General Foam to its distributors, fabricators and down stream users to determine whether the information supplied by General Foam breached the warranty. At present there is no information or discovery with respect to this issue.

Plaintiff has also brought a claim for breach of express warranty. Again, for all the reasons earlier stated the Plaintiff requires discovery.

Under all of the facts and circumstances, without discovery, the Plaintiff is unable to properly address the issues of the intervening acts of third parties that would break the causal

connection as suggested by the Defendant in its Motion to Dismiss and would request that the Court deny the motion as to this issue until adequate discovery is completed.

**The Bulk Supplier Doctrine**

Finally, the Defendant claims that it is protected under the so called "Bulk Supplier Doctrine," claiming that the sale of the Foam by Foamex, (again it was not Foamex, but likely General Foam Corp., that supplied the foam to American Foam Corp.), was merely the raw material component that was re-fabricated by American Foam Corp. into another product and then sold to the Derderians.

Cases imposing liability under this doctrine have usually involved suppliers of a product or a component part that was in substantially in the same condition when used by the consumer as when sold by the supplier. In re Silicone Gel Breast Implants, 887 F. Supp. at 1468 Dole Food v. North Carolina Foam Industry 188 Ariz. 298; 935 P.2d 876 (App. 1996) Here it is unknown whether the foam sold by General Foam was in substantially the same condition as when it was sold by American Foam to the Derderians. Indeed at first blush it appears that American Foam sold large sheets of the foam to the Derderians which they installed on the walls of the Station Night Club. The invoice that accompanies the Defendants Motion to Dismiss, if in fact this is the foam that was sold to the Derderians, suggests that the foam, sold to American Foam, was similar to the foam sold in large sheets to the Derderians. The implication is that the foam was in substantially the same condition when used by the Derderians as when sold by General Foam Again, until discovery is complete it is impossible to properly address this issue.

Moreover, the Defendant claims that the two exceptions to the "Bulk Supplier Doctrine" do not apply, baldly claiming that the Plaintiff cannot prove the Foamex's bulk polyurethane

foam was defectively made or designed. Again, as earlier mentioned the issue of design defect is the subject of discovery and should not be prematurely decided. Secondly, the Defendant claims that American Foam cut and dimpled the foam sold by General Foam. Foamex claims and that the cutting of the foam by American Foam changed it from the originally raw material into a "component part" as defined by the "Bulk Supplier Doctrine." This issue clearly needs discovery and is likely a jury question, for again, other than some news paper descriptions of the foam that was sold by American Foam to the Derderians, we have no knowledge with respect to whether the foam was in substantially the same condition when used by the Derderians as when sold by General Foam.

## CONCLUSION

The Defendant's Motion to Dismiss is based upon actions by Foamex, however, as earlier stated what the Defendant fails to address is the critical preliminary fact that the subject sale of the Foam was not made by Foamex, but by General Foam Corporation, whose assets it purchased.

Also, what the Defendant fails to address are any number of unresolved factual issues with respect to not only the purchase of the foam, but its effects. The most important factual questions as to who actually sold the "foam" to General Foam Corp., who was the person who sold it to the Derderians, what was said, when, and what representation were made if any, are still unanswered.

There are also a myriad of unanswered questions with respect, to the purchase of General Foam Corporation, by Foamex, where it occurred, when it occurred, the terms and condition of the purchase, the liability of Foamex for the acts of General Foam, the liability of Foamex for

other actions of the General Foam Agents.

Moreover, we know absolutely nothing about the actions of General Foam Corporation or its agents. We know nothing about General Foam, or its sale of foam prior to its merger with Foamex, its advertisements, promotions, warnings, lack of warning, representation to costumers, etc.

We also have no information, which we would gather through discovery, with respect to prior knowledge that General Foam or its agents or employees may have had with regards to the foam, its customary use etc.

We also have no information of other research done by General Foam Corporation, its understanding of its use, or its foreseeable misuse.

Each and everyone of the Plaintiffs theories of liability require answers to these questions.

The fact that Foamex gave which may or may not be adequate warnings, is irrelevant, the issue is what did General Foam Corp. or its employees do.

The fact that Foamex sells in bulk again is of little aid, until we determine exactly what was sold by General Foam to American Foam, the terms and conditions, exact warnings if any, and what was sold by American Foam to the Derderians. Until these questions are answered it is premature to rule on the Motion to Dismiss.

Under all these facts Plaintiff would respectfully request that this Court deny the Defendant's Motion to Dismiss until such time as adequate discovery is completed to properly address the issues raised on the Defendant's Motion.

Plaintiffs
By their attorney
BRIAN CUNHA & ASSOCIATES

Brian R. Cunha, Esquire #4074
311 Pine Street
Fall River, MA 02720
Phone: (508) 675-9500
Fax: (508) 679-6360

# EXHIBIT 1

Foamex
Shaping things to come

SENSE



*Find what you're looking for!*



News

## FOAMEX INTERNATIONAL TO

## ACQUIRE ASSETS OF GENERAL FOAM CORPORATIO

---

**LINWOOD, PENNSYLVANIA, July 9, 2001** - Foamex International Inc. (Nasdaq: FMXI), th manufacturer of flexible polyurethane and advanced polymer foam products, announced :oday t agreement to acquire certain assets of General Foam Corporation (GFC), a manufacturer of poly products for the automotive, industrial and home furnishings markets. GFC had revenues of near last year.

"Foamex has grown historically through acquisition," noted Foamex Chairman Marshall S. Cog acquisitions that have significant synergies with our existing businesses continue to be ar import our growth."

John Televantos, President and Chief Executive Officer of Foamex, said, "The GFC transaction our acquisition strategy. General Foam is a quality manufacturer with a strong reputation for cus a commitment to technology. This acquisition strengthens our automotive, technical products an businesses and expands our product and service offerings to our customers."

The transaction, which is subject to approval by Foamex's lenders and certain other conditions, i close by the end of July 2001.

Foamex, headquartered in Linwood, Pennsylvania, is the world's leading producer of corr fort cu bedding, furniture, carpet cushion and automotive markets. The company also manufactures hig polymers for diverse applications in the industrial, aerospace, electronics and computer ir dustrie filtration and acoustical applications for the home. Revenues for 2000 were $1.3 billion.

© 2003 Foamex International Inc. All rights reserved.
Terms of Use

AMERICAN FOAM PRODUCTS INC. PACKAGING SPECIALISTS

★Celebrating 26 years★

*foam fitted to your products the American way!*

## ★FOAMS & RELATED PRODUCTS

ACOUSTICAL FOAM
ANTI STATIC FOAM
PLASTIC MOLDED CASES
CONDUCTIVE FOAM
CONVOLUTED FOAM
CROSSLINK POLYETHYLENE
CUSHIONING
EPS
EXTRUDED POLYSTYRENE
FILTER FOAM
FLOATATION FOAM
FOAM
FURNITURE FOAM
MEMORY FOAM
MOLDED FOAM
PLASTIC CORRUGATED PRODUCTS
POLYETHYLENE
POLYSTYRENE
PVA FOAMS
PVC FOAMS
RIGID FOAM
SOFT FOAM
STYROFOAM
URETHANE

## ★AMERICAN FOAM CAPABILITIES

AIR LINE APPROVED CASES
ATA HEAVY DUTY CASES
CASE INSERTS
COMPUTERIZED CUTTING
CONTOUR FOAM CUTTING
CUSTOM DIE CUT FOAMS
CUSTOM MADE POUCHES
DIE CUTTING
DISPLAY CASES
EXTRUDED FOAM
FOAM DESIGN
FOAM FABRICATORS
FOAM FOR GLASS PROTECTION
FOAM INSERTS
GLUING AND FOAM WELDING
HOT WIRE CUTTING
LAMINATING
NOVELTY FOAM ITEMS
PACKAGE DESIGN
SOUND ABSORBING FOAMS
SOUND DAMPENING FOAMS
TRADESHOW CASES
VACUUM FORMING
WILL MEET GOVERNMENT SPECIFICATIONS

## ★MISC. PACKAGING & STOCK ITEMS

BACKER ROD
BEAN BAG FILL
BOW CASES
BUBBLE WRAP
CORNER BLOCKS
CUSHIONED PALLETS
EGG CRATE FOAM
EPS GRIND AND CUBES
FOAM TAPES
GLUE AND GLUING SUPPLIES
GUN CASES
JIFFY MAILERS
PACKAGING FOR INDUSTRIAL PRODUCTS
PACKAGING SUPPLIES
PADDING FOR PACKAGING
POLYURETHANE FOAM CUSHIONING
PROTECTIVE PACKAGING
REUSABLE TOTES
SLIT AND PERFED ROLL STOCK
SHIPPING SUPPLIES
SHOCK WATCH LABELS
SILICONES
SIMUVEL PICK AND PLUCK FOAM
TILT WATCH LABELS

{ ENTER MAIN SITE }

AMERICAN FOAM PRODUCTS INC.
PACKAGING SPECIALISTS

- FOAMS & RELATED PRODUCTS
- CAPABILITIES
- MISC. PACKAGING & STOCK ITEMS
- HOME

WE ACCEPT

VISA MasterCard

# Foams & Related Produc

753 LIBERTY ST | PAINESVILLE, OH 44077 | P: 440.352.3434 | F: 440.352.01:4
e-mail: afp@mailbag.net | web: www.americanfoamproducts.com

**PROFILE POLYETHYLENE EXTRUSIONS**
Almost any shape can be extruded. Your imagination is all that is needed.



**MOLDED POLYURETHANES**
**RIGID FOAM**
**FLEXIBLE FOAM**



**POLYMER COATED EPS**
**BUILDERS - CONTRACTORS**



**EPS GRIND**



**EPS FILL**

**PLASTIC BOXES AND CASES**

The Perfect Container For:
- Exhibit and Tradeshow Use
- Computer Hardware
- Presentation Products
- Electronic Components
- Transporting Training Modules
- Video and Audio/Visual Equipment

For the avid hunter, we have r fle cases and bow cases available

The Ultimate Sales Tool:
Your product displayed in a professionally-designed case.
Multiple Standard Sizes.



**EXPANDED POLYSTYRENE**
Molded appearance without the high tooling charges through our CAD/CA system.



**ANTI-STATIC AND CONDUC^IVE**
- Workstations
- In-Plant transfers
- Pre-assembly storage protection
- Shipping containers





**POLYETHYLENE AND POLYURETHANE FOAMS**

Die-cut to your specifications.



- In-plant use: totes, trays, cargo-tainers
- Reuseable inter-plant material handling
- Final shipping protection
- High-impact resistance
- High-impact protection
- Low Deceleration ("G" Force)
- Various initial load deflection (1.L.D)
- Contour cutting (3-dimensional)
- Delicate product protection
- Designed packaging helps reduce packaging cost.
- Customized to meet your specific applications.
- Professional appearance to your customers.
- Designed samples provided at no or minimum cost.



*Foam Fitted to Your Products the American Way!*

# EXHIBIT 2

Because luxury doesn room for fiber



Find what you're looking for!



## About Foamex

Foamex is the leading producer of flexible polyurethane foam for the bedding, furniture, carpet cushion and automotive markets as well as technical foams for diverse applications in industrial, consumer, electronics and transportation industries.

You will find Foamex foams inside, around and under thousands of products from hundreds of manufacturers. They protect automobile passengers on the highway and fragile electronic components in shipment. They help consumers sleep sounder and furniture manufacturers create more comfortable products. They add to the luxury and performance of home and commercial carpeting. They are used in filters, dispensers, gaskets and seals in everything from blood oxygenators to computer disk drives.

If you need a polyurethane foam or polymer product off the shelf, Foamex makes the finest quality and greatest variety available from any manufacturer. To discover where we really shine, bring your wish list to our design and technical teams and imagine the possibilities. Everyday, we meet the challenge of shaping things to come.

**Industry Leadership**

Foamex is the largest, most versatile supplier of flexible polyurethane and advanced polymer products in North America. Foamex does business through the following four business units:

- Foam Products - Products that are used in bedding, pillows, sofas, and couches.
- Automotive Products - Polyurethane products that are used in over twenty different applications in today's automobiles, minivans, sport utility vehicles and pickup trucks.
- Carpet Cushion Products - Includes rebond, sponge rubber, felt and prime polyurethane carpet underlay.
- Technical Products - Includes a host of products used in a variety of applications including acoustics, gasketing, resevoiring, and filtration.

Foamex is the:

#1 Polyurethane Foam Producer

#1 Bedding Foam Supplier

#1 Automotive Trim Foam Supplier

#1 Carpet Cushion Producer

#1 Technical Products Leader

#2 Furniture Foam Supplier

**Customer-Focused Technology**

Foamex designers and engineers work with customers to develop innovative solutions for specific applications. Our scientists are experts on everything from polymer chemistry to manufacturing processes to emerging technologies.

**New Product Development**

Foamex is the pioneer in the development and commercialization of unique polyurethane products. We currently hold more than 225 patents, and offer technologies that cannot be duplicated elsewhere, including SMT[SM], VPF[SM] and CPC[SM].

**Quality Assurance**

Foamex was one of the first polyurethane manufacturers to complete QS-9000 and ISO-9001 certification for our facilities serving the automotive industries.

**Customer Service**

Foamex has the largest manufacturing and distribution network in North America, to facilitate just-in-time delivery nationwide. We also continue to expand our operations in Mexico and Asia. For more information on Foamex Asia, Click here

© 2003 Foamex International Inc. All rights reserved.
Terms of Use

Foamex
Shaping things to come

Because luxury doesn
room for fiber



Find what you're looking for!

- Overview
- Kids/Young Adults
- Order: Early Childhood Products
- Sleep Surface Pads
- Pillows
- Family Room
- Travel Products
- Contact Info
- Recall Alert

## Consumer Products

**We manufacture a variety of products sold directly to retailers to satisfy the varied needs. These products include state of the art mattress pads and pill furniture and travel comfort products.**

Click the Contact Us button to send us an e-mail with any questions regarding our Consumer Pro

© 2003 Foamex International Inc. All rights reserved.
Terms of Use

## Cushioning Products

Foamex has become the market leader in cushioning products for furniture by offering three bene apart:

- A full range of furniture products in a range of densities, thicknesses and firmnesses, inclu toppers, convolute and convoluted rolls. We meet demanding specifications and tight tim
- A nationwide network of manufacturing, fabrication, distribution and sales locations. Thro facilities, we provide just-in-time delivery to furniture manufacturers throughout North Ame of pouring facilities produces a wide variety of ether, ester, fire retardant and HR foams to of fabricator/distributors.
- An innovative approach to satisfying customer needs.

**Products**

- Contour Cut Foam Products
- Deck Pads
- Fiber Wrapped Products
- Fire Retardant Foam Products
- High Resilient (HR) Foam Products
- Viscoelastic Foam Products

**Brand Names**

- DriFast®

Reflex

**Contour Cut Foam Products**

Foamex contour cut products include furniture seat cushions, backs, packaging materials and ma From straight-cut applications to complex and highly contoured packaging products, we work clo customers to deliver contour cut products cost effectively and on-time. And our nationwide techni manufacturing capabilities assure that you have the resources on hand to meet your needs. Typi for furniture products: 1.2 lbs. to 1.8 lbs./cu. ft.

**Deck Pads**

Foamex offers a complete range of deck pads for upholstered furniture applications. Deck pads range of weights, cut to specification.

**Fiber Wrapped Products**

Foamex creates fiber wrapped foam products, typically for furniture back and selected seat applic exact comfort requirements. Bonded and low-melt applications are available in a variety of weight fabricating and gluing operations facilitate production to exacting customer specifications.

**Fire Retardant Foam Products**

Foamex offers fire retardant products designed to meet California Bulletin 117 or other similar req almost all foam grades and end products.

**High Resilient (HR) Foam Products**

Foamex manufacturing capabilities include high resilient (HR) foam products, minimum 1.8 lbs./c enhanced comfort and support, typically for furniture seat cushion applications.

**Viscoelastic Foam Products**

Foamex viscoelastic foam products are slow-recovery foams with special shape conforming prop pressure point relief to virtually any bedding product.

**DriFast®**

DriFast® is a technologically advanced, mildew resistant product for outdoor and marine seating exposure to water creates the need for enhanced drainability, durability and comfort.

© 2003 Foamex International Inc. All rights reserved.
Terms of Use

Foamex
Shaping things to come

– your dema
bette



*Find what you're looking for!*



## Technical Products

Acoustical Functions

TPG Data Sheet - Acoustical Functions

**Acoustical Functions - absorbing, dampening of sound from electronic equipment**

Applications include:

A. Office Equipment –sound absorption, as a sound transmission sound barrier
B. Audio Equipment – application includes sound absorptions and sound transmission for st grilles, earphones, microphone windscreen covers, etc.

Acoustic foam will absorb the activity of airborne or fluid borne noise, causing a loss in energy by reflected vibrations. The sound vibration pulses are "tired out" by their efforts to force the foam str and the noise, reflected level is, therefore, immediately reduced.

Properties:

- Felting capability to fine-tune products to meet absorption at different frequencies.
- Flame retardant
- Custom Lamination for aesthetics
- Controlled cell structure
- Fabrication of multiple layers for sound attenuation optimization.

**For more information or to request a sample(s) contact:**

TECH LINE 1-800-767-4997
techline@foamex.com

© 2003 Foamex International Inc. All rights reserved.
Terms of Use

TECHNICAL

PRODUCT

FUNCTION

SHEET

Foamex

# *Acoustical Functions*

## *Absorbing · Dampening · Acoustical Transparency*

### General Description

Foamex acoustical materials are designed to perform a number of specific and seemingly opposite acoustical functions...either reducing sound levels, or passing sound undistorted and undiminished...each determined by both the basic design of the foam and its method of application. Certain non-reticulated foams are ideal for sound absorption and attenuation. Reticulated foams can absorb sound very effectively or can be completely acoustically transparent. Noise absorption applications include: commercial aircraft ventilation ducts; headliners and back panels for tractor cabs and off-road vehicles; data-processing equipment; portable air compressors and power units; appliances; snowmobiles; as well as headliners and panels for automobiles.

Sound fidelity applications include: stereo speaker grilles, earphones, and microphone covers.

Benefits included are: predictable sound absorption in broad band (low, mid, high) frequency range from engineered foam grades; nearly "total perfection in sound transparency applications (polyurethane foam is 97% air) from other selected grades; fabrication design flexibility; functional/decorative laminate capabilities; installation ease; excellent shape retention, and resistance to wear and abrasion.

### Noise Absorption

Acoustical foam will absorb the activity of airborne or fluid-borne noise, causing a loss in energy by weakening reflected vibrations. The sound vibration pulses are literally "tired out" by their effort to force the foam strands to vibrate...and the noise reflected level is, therefore, immediately reduced. Acoustical foam for sound absorption provides the foam high efficiency, consistent throughout, and predictable from installation to installation.

**Applications Include**: Automobile headliners, truck, tractor, off-road vehicle cab liners, office equipment, industrial machinery, marine applications, anechoic test chambers.



## Acoustical Functions

| Product | Function | Application |
|---|---|---|
| *SIF® (Fine and Coarse Pore) | Sound Absorber | Anechoic chambers and noise test facilities |
| *SIF® (Medium Pore) | Air Diffuser | Microphone wind screen covers, power brake units, mufflers |
| *SIF II® (Medium Pore) | Acoustically Transparent | Hi Fi speaker grilles |
| *SIF Felt® | Sound Absorber | Tuned for mid and high frequencies |
| *Aerofonic® | Sound Absorber | FAR 25.853 extended environmental use felt designed for aircraft |
| **Aresto II® | Sound Absorber | General use where flammability and economy are important |
| **Pyrell® | Sound Absorber | General use where maximum flammability protection is a concern |
| HyFonic® | Sound Absorber | An extended environmental foam where flammability is a concern |
| Fine-Pore Acoustical | Sound Absorber | General use where economics is the major concern |
| Custom Lamination | Sound Absorber<br>Moisture Barrier | Where special barriers are needed and/or aesthetics are important |

**Engineered to be predictable from run to run based on close tolerances, for density permeability and pores per lineal inch (ppi)*

***Available in 4 lb/ft³ density*

## Typical Physical Properties of Foamex Acoustical Materials

| | SIF® Industrial Foam | SIF Felt® | Aresto® II | Pyrell® | HyFonic® I | Aerofonic® Felt |
|---|---|---|---|---|---|---|
| Grade | 90 ppi | 3-900 | 70 ppi | 70 ppi | 65 ppi | 4-700 |
| Density (lb/cu. ft) | 1.9 | n/a | 2.0 | 2.0 | 1.7 | n/a |
| Tensile Strength (PSI) | 35 | n/a | 20.0 | 22 | 14 | n/a |
| Elongation (%) | 415 | n/a | 190 | 220 | | n/a |
| Polyol | Polyester Polyurethane | Polyester Polyurethane | Polyester Polyurethane | Polyester Polyurethane | Polyether Polyurethane | Polyether Polyurethane |

*Tested in accordance with ASTM 3574. Physical properties not to be used as a specification.*

## Vibration Isolation

Noise transmission sound barriers are used to reduce the noise level being transmitted through a housing when the housing itself does not satisfactorily perform that function. When noise levels are severe, an additional high mass transmission-reduction wall or septum is often required. Acoustical foam is applied as a decoupler between the housing and the inner septum, and as an absorber on the outer septum wall, to effectively absorb and reduce the noise energy flow.

**Applications Include:** Acoustical panels, aircraft, turbine engines, broadcast studios' data processing equipment, power generator housings, automotive headliner.

## Vibration Damping

Acoustical foams are used to reduce vibrations of physical structures that, in turn, produce noise due to that vibration. In some cases, for maximum vibration reduction, acoustical foams are used in conjunction with a damping layer, such as a viscoelastic material.

**Applications Include:** Air conditioning equipment, dishwashers, aircraft compartments, high-speed rail cars, data processing machines, enclosed power units, engine housing.

## Sound Fidelity

Reticulated acoustical foams have been proven virtually acoustically transparent; effectively invisible to sound waves in audible frequencies. This is true even of foam two inches thick. A leading California stereo speaker manufacturer made this fact well-known by introducing a line of speakers that offered nearly perfect sound transparency through striking design-sculptured foam grilles in a variety of colors.

**Applications Include:** Stereo speaker grilles, earphones, microphone windscreen covers, smoke alarm grilles.

## Acoustical Foam Types
## Industrial Foam (SIF®)

SIF® is reticulated, 90 pores-per-linear-inch (ppi) polyurethane foam with excellent uniformity and predictability. It is particularly effective where it can be used in a thickness above two inches. . .in the anechoic chambers of sound testing facilities, for example.

## SIF Felt® Acoustical Foam

SIF Felt® is 90 ppi reticulated foam that has been permanently compressed by both heat and pressure; sound absorption properties can be tuned to selected frequencies by specifying thickness and final felt "firmness grade." SIF Felt® is specified where both space and predictable performance are important factors.

## Custom Lamination

Perforated vinyl, Mylar* adhesive, or other approved substrates, can be specifically flame-bonded to Foamex acoustical materials according to specific customer needs.

*Registered trademark of The DuPont Company.

**Typical Values of Random Absorption Coefficients**



# AFFIDAVIT OF
# BRIAN R. CUNHA, ESQUIRE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

LINDA RODERIQUES, as Administratrix of the Estate of DONALD RODERIQUES; LINDA RODERIQUES Individually; LINDA RODERIQUES, as Mother and Next Friend to MANDI RODERIQUES, minor

Plaintiffs,

C.A. No. 04-26-L

V.

AMERICAN FOAM CORPORATION; FOAMEX INTERNATIONAL; BARRY H. WARNER; TRITON REALTY LIMITED PARTNERSHIP; JEFFREY DERDERIAN; MICHAEL DERDERIAN; DERCO, LLC; MANIC MUSIC MANAGEMENT, INC.; JACK RUSSELL, MARK KENDALL; DAVID FILICE; ERIC POWERS; DANIEL BICHELE; PAUL WOOLNOUGH; KNIGHT RECORDS INC.; ANHEUSER-BUSCH COMPANIES, INC.; MCLAUGHLIN & MORAN, INC.; LUNA TECH, INC.; LUNA TECH PYROTECHNIC GMBH; CLEAR CHANNEL COMMUNICATIONS INC., d/b/a WHJY-FM; MOTIVA ENTERPRISES, LLC; SHELL OIL COMPANY; TOWN OF WEST WARWICK, DENNIS LAROCQUE, STATE OF RHODE ISLAND and IRVING J. OWENS.

Defendants

# AFFIDAVIT OF BRIAN R. CUNHA, ESQUIRE

I, Brian R. Cunha, Esquire, after being duly sworn, do depose and say under oath as follows:

1. That I am the Attorney representing the Plaintiffs in the above-named case.

2. That I have an inability to respond to the Motion To Dismiss or the Summary Judgment Motion because of incomplete discovery

3. That I have an authentic need, as more fully described below and as outlined in the Memorandum in Opposition to the Defendant's, and require an additional interval in which to marshal facts to mount an opposition to the Defendant's Motion. Resolution Trust Corp. v. N. Bridge Assocs. Inc. 22 F. 3d 1198, 1203 (1st Cir. 1994); Vargas Ruiz v. Golden Arch Development Inc. 03-2225 (1st Cir. 2004)

4. It is anticipated that fact depositions and discovery will yield sufficient information to properly address the issues raised by the Defendant in its Motion.

5. The fact information that is required at a minimal is as follows;

6. Who actually sold the "foam" to General Foam Corp. Who was the person who sold it to the Derderians, what was said, when, and what representation were made if any, are still unanswered.

7. There are also a myriad of unanswered questions with respect, to the purchase of General Foam Corporation, by Foamex, where it occurred, when it occurred, the terms and condition of the purchase, the liability of Foamex for the acts of General Foam, the liability of Foamex for other actions of the General Foam Agents.

8. The actions of General Foam Corporation or its agents with respect to the sale of the foam to American Foam.

9. The sale of foam prior to its merger with Foamex, its advertisements, promotions, warnings, lack of warning, representation to costumers, etc.

10. The prior knowledge that General Foam or its agents or employees may have had with regards to the foam, its customary use, flammability, production etc.

11. Research done by General Foam Corporation, with respect to its toxicity and

12. Each and everyone of the Plaintiffs theories of liability require answers to these questions.

13. I further refer this Court to the Memorandum of Law attached hereto and incorporate by reference the reasons cited in the Memorandum for the inability to respond to the Defendants Motion to Dismiss without proper discovery.

Signed under the pains and penalties of perjury this 17th day of June, 2004

Brian R. Cunha, Esquire

**RODERICK CERTIFICATION**

I hereby certify that on the 17th day of June, 2004 a true copy of the within was mailed to:

James A. Ruggieri, Esq.
Gerald C. DeMaria, Esq.
Higgins, Cavanagh & Cooney
123 Dyer Street
Providence, RI 02903

Christopher C. Fallon, Jr., Esq.
Cozen O'Connoer
1900 Market Street
Philidelphia, PA 19103-3508

James R. Lee, Esq.
Department of Attorney General
150 South Main Street
Providence, RI 02903

W. Thomas McGough, Jr., Esq.
James J. Restivo, Esq.
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219

Edward T. Hinchey, Esq.
Sloane and Walsh LLP
Three Center Plaza, 8th Floor
Boston, MA 02108

William P. Robinson, III, Esq.
Stephen M.Prignano, Esq.
Stephen J. MacGillvray, Esq.
Edward & Angell, LLP
2800 Financial Plaza
Providence, RI 02903

James H. Reilly, Esq.
Donald Maroney, Esq.
Kelly, Kelleher, Reilly & Simpson
146 Westminster Street, Suite 500
Providence, RI 02903

Mark T. Renolds, Esq.
Anthony DeMarco, Esq.
Reynolds, DeMarco, & Boland, Ltd.
170 Westminster Street, Suite 200
Providence, RI 02903

Marc DeSisto, Esq.
DiSisto Law Office
211 Angell Street, P.O. Box 2563
Providence, RI 02903-2563

Andrew J. Trevelise Esq.
Reed Smith LLP
2500 One Liberty Place
Philadelphia, PA 19103-7301

Fred A. Kelly, Jr., Esq.
Randall Sousa, Esq.
Nixon Peabody, LLP
One Citizens Plaza
Providence, RI 02903

Howard A. Merten, Esq.
Vetter & White
20 Washington Place
Providence, RI 02903

Carl A. Henlein, Esq.
John R. Crocket, III, Esq.
Susan S. Wettle, Esq.
Frost Brown Todd
400 West Market Street, 32nd Floor
Louisville, KY 40202-3363

Scott J. Tucker, Esq.
Tucker, Heifetz & Saltzman, LLP
Three School Street
Boston, MA 02108

Ronald Langlois, Esq.
Lauren DiSimone Wilkins, Esq.
Smith & Brink, P.C.
One State Street, Suite 401
Providence, RI 02908

Faith A. LaSalle, Esq.
One Turks Head
76 Westminster Street
Providence, RI 02903

Donna M. Lamontagne, Esq.
Steven T. Hayes, Esq.
Zizik Powers, O'Connell, Spaulding Lamontagne
40 Westminster Street
Providence, RI 02903

Curtis R. Diedrich, Esq.
Sloane and Walsh, LLP
127 Dorrance Street
Providence, RI 02903

Brian R. Cunha, Esquire